UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

BATTLE CREEK HEALTH SYSTEM, *et al.*,

Plaintiffs,

v.

XAVIER BECERRA, in his official capacity as Secretary of Health and Human Services,

Defendant.

Civil Action No. 17-0545 (CKK)

MEMORANDUM OPINION
(October 31, 2023)

In this Medicare administrative dispute, twenty-six regional hospitals challenge the dismissal of their appeal by the Provider Reimbursement Review Board ("PRRB," or "the Board"). The Board, a subagency of the Centers for Medicare & Medicaid Services ("CMS"), is charged by statute with reviewing appeals by providers dissatisfied with "final determinations" related to reimbursement for the provision of medical services to individuals covered by Medicare. 42 U.S.C. § 1395oo. Plaintiffs maintain, as they did during the underlying administrative proceedings, that they were undercompensated for services rendered to patients eligible for certain Medicare benefits. Without reaching the merits of that challenge, the PRRB dismissed Plaintiffs' administrative appeal, concluding that action on which Plaintiffs based their administrative appeal, CMS's publication of patient data that Defendant uses to determine Plaintiffs' eligibility for certain reimbursements, was not a "final determination" within the meaning of 42 U.S.C. § 1395oo, rendering the PRRB without jurisdiction. Plaintiffs now appeal that legal conclusion to this Court.

Ultimately, the Court agrees with Plaintiffs that, contrary to the PRRB's conclusion, the publication at issue was a "final determination" within the meaning of 42 U.S.C. § 1395oo that

1

vested the PRRB with jurisdiction over Plaintiffs' administrative action. Because the PRRB is better equipped to answer the merits question in the first instance, however, the Court stays this matter pending the PRRB's consideration of the appropriate reimbursement calculation on remand. Accordingly, upon the consideration of the pleadings,[1] the relevant legal authority, and the entire record, the Court **GRANTS IN PART AND DENIES IN PART** Plaintiffs' [25] Motion for Summary Judgment, **GRANTS IN PART AND DENIES IN PART** Defendant's [28] Cross-Motion for Summary Judgment.

## I.   BACKGROUND

### A.   Factual and Statutory Background

The Medicare Program is a federal health insurance program that pays for medical care for people 65 years of age or older, certain younger disabled people, and people with kidney failure. *See UnitedHealthcare Ins. Co. v. Becerra*, 16 F.4th 867, 872 (D.C. Cir. 2021). The Secretary of Health and Human Services is responsible for administering the Medicare Program through the Centers for Medicare and Medicaid Services ("CMS") and its Medicare Administrative Contractors ("MAC"). *Popkin v. Burwell*, 172 F. Supp. 3d 161, 166 (D.D.C. 2016). The MACs

---

[1] The Court's analysis has focused on the following documents:
- Plaintiffs' Motion for Summary Judgment ("Pls.' Mot."), ECF No. 25;
- Defendants' Cross-Mot for Summary Judgment and Opposition to Plaintiff's Motion for Summary Judgment ("Defs.' Cross-Mot"), ECF No. 28;
- Plaintiffs' Memorandum in Response to Defendant's Cross-Motion for Summary Judgement and Reply to Defendant's Response to Plaintiff's Motion for Summary Judgement ("Pls.' Repl."), ECF No. 31;
- Defendants' Reply in Support of their Cross-Motion for Summary Judgment ("Defs.' Repl."), ECF No. 32; and
- The Administrative Record (AR), ECF No. 33.

In an exercise of its discretion, the Court concludes that oral argument would not be of assistance in resolving this matter.

are generally private insurance companies that administer routine Medicare payment functions in a given geographic area. *See id.*

For acute-care inpatient services administered under Medicare, hospitals are paid pursuant to a Prospective Payment System ("PPS"). 42 U.S.C. § 1395ww(d). Under the PPS, hospitals are generally paid a predetermined rate based on a classification of an inpatient's illness. In addition to that standard amount under the PPS, hospitals may receive an "additional payment" each year if they "serve [] a significantly disproportionate number of low-income patients." 42 U.S.C. § 1395ww(d)(5)(F)(i)(I). The additional payment is known as the "disproportionate share" or "DSH" payment. *See id.* Whether a hospital is eligible for DSH payment and the amount of that payment in a given year is determined by a statutorily defined formula, which is the sum of two fractions: the Medicare (or SSI) fraction and the Medicaid fraction. *Id.* The sum of these two fractions is also termed the "disproportionate patient percentage" or "DPP." Medicare Claims Processing Manual, Chapter 3 - Inpatient Hospital Billing, at 59 (Feb. 2, 2023) *available at* https://www.cms.gov/regulations-and-guidance/guidance/manuals/downloads/clm104c03.pdf (last accessed October 29, 2023 5:19 PM ET) (hereinafter "Processing Manual").

The Medicare fraction approximates the proportion of Medicare patients the hospital served during that year who are low-income. *Id.* at 51. The numerator of the Medicare fraction is the number of patient days for patients who were both "entitled to benefits under [Medicare] part A" and "entitled to [SSI] benefits" and the denominator is the number of patient days for patients who were "entitled to benefits under part A." 42 U.S.C. §1395ww(d)(5)(F)(vi)(I). The Medicaid fraction represents the ratio of the hospital's patients served during that year who are eligible for Medicaid relative to the hospital's total patients. *Id.* (F)(vi)(II). Accordingly, the numerator of that fraction is the number of patient days in which the hospital treated those who were eligible for

3

Medicaid, "but who were not entitled to benefits under part A" and the denominator consists of "the total number of the hospital's patient days." *Id*.

Without access to SSI data that is maintained by the Social Security Administration, Plaintiffs lack the information necessary to determine a hospital's Medicare fraction. *See* Processing Manual at 54. As a result, CMS obtains the SSI data from the Social Security Administration, calculates the DPP which includes both the Medicare and Medicare fraction for each hospital and publishes it all on its website. *Id.* at 56. If a hospital is above a certain DPP, they qualify for a DSH adjustment. *Id.* at 51.

Once CMS publishes the percentages, they also provide the data to the appropriate MAC. Because the SSI/Medicare percentages are determined by CMS on a fiscal year basis, hospitals are also afforded the option (for settlement purposes) of determining their SSI/Medicare percentage based upon data from their own cost reporting period. *Id.* If a hospital avails itself of this option, it must provide its MAC, in a manner and format prescribed by CMS, with data on its Medicare patients for the cost reporting period. *Id.*

In this case, the relevant MAC is the Wisconsin Physicians Service, covering the area where the hospitals here are located. With the DPP data from CMS, that MAC will identify hospitals that are eligible to receive the DSH adjustment and make interim payments subject to a year-end settlement based upon the hospital's DSH percentage for the cost reporting period. *Id.* at 56. The DSH payment increase varies from hospital to hospital, and depends on a number of factors, including a hospital's bed count and its location. *Id.* With the DPP, the MAC calculates a DSH adjustment for individual hospitals using the relevant factors.

//

//

Below is a table of how the DSH adjustment factor is calculated. *Id.* at 53-57.

| Status/Location | Number of Beds | DPP Threshold to Qualify | Adjustment Formula |
|---|---|---|---|
| Urban Hospitals | 0–99 Beds | ≥15%, ≤20.2% | 2.5% + [.65 x (DPP−15%)] Not to Exceed 12% |
| Urban Hospitals | 0–99 Beds | ≥20.2% | 5.88% + [.825 x (DPP−20.2%)] Not to Exceed 12% |
| Urban Hospitals | 100 or More Beds | ≥15%, ≤20.2% | 2.5% + [.65 x (DPP−15%)] No Cap |
| Urban Hospitals | 100 or More Beds | ≥15%, ≤20.2% | 5.88% + [.825 x (DPP−20.2%)] No Cap |
| Rural Referral Centers | N/A | ≥20.2% | 2.5% + [.65 x (DPP−15%)] No Cap |
| Rural Referral Centers | N/A | ≥20.2% | 5.88% + [.825 x (DPP−20.2%)] No Cap |
| Other Rural Hospitals | 0–499 Beds | ≥15%, ≤20.2% | 2.5% + [.65 x (DPP−15%)] Not to Exceed 12% |
| Other Rural Hospitals | 0–499 Beds | ≥20.2% | 5.88% + [.825 x (DPP−20.2%)] Not to Exceed 12% |
| Other Rural Hospitals | 500 or More Beds | ≥15%, ≤20.2% | 2.5% + [.65 x (DPP−15%)] No Cap |
| Other Rural Hospitals | 500 or More Beds | ≥20.2% | 5.88% + [.825 x (DPP−20.2%)] No Cap |

The MAC multiplies this DSH adjustment percentage against the standard PPS amount that the hospital would otherwise be receiving. *Id.* at 54. This amount equals a hospital's DSH adjustment payment for the year. It is basically a year-end lump sum adjustment. *Id.* at 56.

Baked into the math is a key legal disagreement between the parties: whether to count Medicare Part C enrollees as patients "eligible" for Medicare Part A. That issue is, quite literally, the million-dollar question for Plaintiffs. If not, Plaintiffs are due much more in reimbursement than CMS ultimately provided. Yet, as discussed further below, that merits question is not before the Court. At present, the only question before the Court is whether certain DSH adjustments published by CMS reflected a sufficiently "final" decision on the matter as to permit the PRRB to decide it.

5

B. **Procedural Background and Administrative Decision**

This dispute ultimately dates to as early as 2009. On July 24 of that year, CMS issued a "Transmittal 1774," which provided the underlying, "updated data" for DSH adjustments for the settlement of FY 2007 cost reports, yet to be completed. CMS, Transmittal 1774/Change Request 6530 at 1 (July 24, 2009) *available at* https://www.cms.gov/Regulations-and-Guidance/Guidance/Transmittals/downloads/R1774CP.pdf (last accessed October 29, 2023 8:38 PM ET). This data effectively decided what kind of patients would be counted in the numerator of the key fraction, and the transmittal and "instruct[ed]" MACs in how to calculate DSH payments. *Id.* at 3. On appeal, some of the present Plaintiffs challenged what they characterized as "CMS's erroneous inclusion of inpatient days attributable to Medicare Advantage patients" in the Medicare fraction in this transmittal. AR 239. In 2013, six more hospitals, Plaintiffs here, were added to the group appeal. AR 1. Each of those newly added hospitals appealed a "notice of program reimbursement" (or "NPR"), in which a MAC informs an individual hospital the precise amount of reimbursement. *See* 42 C.F.R. § 405.1803. The group appeal sought to challenge what they considered to be "CMS's erroneous inclusion of inpatient days attributable to Medicare Advantage (MA) patients in both the numerator and the denominator of the [SSI] fraction." AR 239.

The PRRB issued an initial jurisdictional decision on January 26, 2017, dismissing the Plaintiffs hospitals' group appeal for lack of jurisdiction. AR 1. In its decision, the PRRB first noted that the six newly added hospitals appealed from different "determinations" than those involved in the original hospitals' appeal. AR 2. Specifically, the PRRB noted that the newly added hospitals had appealed based on NPRs or revised NPRs and that their underlying appeals challenged the updated SSI fractions that CMS had published in 2012 rather than those published

6

in 2009. *Id*. Accordingly, the PRRB bifurcated the group appeal, separating the hospitals appealing from an NPR or revised NPR from the twenty-six hospitals challenging the SSI fractions that had been published on CMS's website in 2009. *Id*.

For those hospitals that appealed from the 2009 SSI fractions that are at issue in this case, the PRRB seemed to initially accept jurisdiction in this matter. On January 16, 2010, the Lead Intermediary responded to the appeal with a letter directly stating there are "no jurisdictional impediments [] noted at this time." AR 208. On January 26, 2017, the PRRB then dismissed the appeal for lack of jurisdiction because of the PRRB's determination that Plaintiff Hospitals' appeal did not stem from a final determination. AR 1. The Board explained that it lacked jurisdiction because the SSI fractions on CMS's website are not a "final determination" as required under 42 U.S.C. § 1395oo(a) for an appeal to the Board.

That statute contains two distinct provision for what constitutes "final determinations." Relevant here is the second provision, permitting an appeal where a hospital "is dissatisfied with a final determination of the Secretary as to the amount of the payment under subsection (b) or (d) of section 1395ww of this title." 42 U.S.C. § 1395oo(a)(1)(A)(ii). The Board reasoned that the SSI fractions are not final determinations of DSH payment, interpreting the statutory language to mean that determination "hinge[s] upon the completion and settlement of a provider's cost report." AR 6. The Board further explained it lacked jurisdiction because "the SSI ratios at issue (dated June 24, 2009) have never been incorporated into settled cost reports (and associated NPRs)." *Id*. The Board wrote that it "logically follows that a provider may not appeal DSH-related issues prior to the final settlement of its cost report." *Id*. Plaintiffs now ask the Court to reinstate the appeal and remand the matter back to the PRRB for adjudication on the merits.

## II. LEGAL STANDARD

Under Rule 56(a) of the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." However, "when a party seeks review of agency action under the APA [before a district court], the district judge sits as an appellate tribunal. The 'entire case' on review is a question of law." *Am. Bioscience, Inc. v. Thompson,* 269 F.3d 1077, 1083 (D.C. Cir. 2001). Accordingly, "the standard set forth in Rule 56[ ] does not apply because of the limited role of a court in reviewing the administrative record . . . . Summary judgment is [ ] the mechanism for deciding whether as a matter of law the agency action is supported by the administrative record and is otherwise consistent with the APA standard of review." *Southeast Conference v. Vilsack*, 684 F. Supp. 2d 135, 142 (D.D.C. 2010).

The APA "sets forth the full extent of judicial authority to review executive agency action for procedural correctness." *FCC v. Fox Television Stations, Inc.,* 556 U.S. 502, 513 (2009). It requires courts to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "This is a 'narrow' standard of review as courts defer to the agency's expertise." *Ctr. for Food Safety v. Salazar*, 898 F. Supp. 2d 130, 138 (D.D.C. 2012) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983)). As the "focal point" in administrative review, the Court's inquiry is limited to the administrative record before it. *Camp v. Pitts*, 411 U.S. 138, 142 (1973). Absent special circumstances, the Court is not to consider evidence outside the record or arguments not raised before the agency. *See Am. Bottling Co. v. NLRB*, 992 F.3d 1129, 1139 (D.C. Cir. 2021).

### III.     DISCUSSION

To evaluate Plaintiffs' claim that the Secretary has misread what is a final determination, the Court must first apply "the ordinary tools of statutory construction" to determine "whether Congress has directly spoken to the precise question at issue." *Chevron U.S.A., Inc. v. NRDC*, 467 U.S. 837, 842 (1984). "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *City of Arlington, Tex. v. FCC*, 569 U.S. 290, 296 (2013) (quoting *Chevron*, 467 U.S. at 842-43). As with all statutory interpretation, the Court "will not resort to legislative history to cloud a statutory text that is clear." *Citizens for Resp. & Ethics in Wash. v. FEC*, 904 F.3d 1014, 1018 (D.C. Cir. 2018). If, however, "the statute is silent or ambiguous with respect to the specific issue," the Court must determine what deference to give to the agency's interpretation. *Chevron U.S.A., Inc.*, 467 U.S. at 844.

It appears that the Board's primary legal position—only a cost report is a "final determination"—is foreclosed by appellate precedent. For instance, the D.C. Circuit has held that any administrative action that provides a "hospital] [with] advance knowledge of the amount of payment it will receive" is a "final determination." *See Wash. Hosp. Ctr. v. Bowen*, 795 F.2d 139, 141 (D.C. Cir. 1986); *Cape Cod Hospital v. Sebelius*, 630 F.3d 203 (2011) (holding that an agency may appeal to the PRRB from issuance of the Final Inpatient Prospective Payment System Rule). In other words, section 1395oo permits providers to prospectively appeal what they will, in the future, receive as a result of services provided to eligible patients. *Bowen*, 795 F.2d at 145. Subsection 1395oo(a)(1)(A)(ii) also "eliminates the requirement that [a provider] file a cost report prior to appeal." *Id.*

9

It would appear that the publication provided, with some finality, "advance knowledge of the amount of [the DSH] payment." The administrative action here, Transmittal 1774, clearly instructed MACs in how to calculate DSH payments. Those calculations were a *fait accompli* as to whether to count Medicare Part A patients in the numerator as well. As a result, the PRRB has jurisdiction to consider the decision on DSH calculations in the Transmittal, because the Transmittal governed, at that point, "*some* aspect of the calculation of [the] target amount or hospital-specific rate" for Medicare reimbursement. *Bowen*, 795 F.2d at 145 (emphasis added).

In the face of *Bowen*'s clear instruction here, Defendant offers two main distinctions with no material difference. First, Defendant argues that, that unlike the rates in *Wash. Hosp.*, the SSI ratios were published after the relevant fiscal year. Def.'s Cross-Mot at 22. Second, as *Wash. Hosp.* makes clear, the key question is whether a publication establishes a change in the tabulation of the particular fraction, not when precisely the publication was issued. 795 F.2d at 148. To be sure, an earlier publication provides hospitals with clearer financial planning, but the injury accrues for the purposes of the relevant statutory subsection when hospitals are informed that they will receive a smaller reimbursement based on a particular fractional determination.

Next, Defendant argues that the SSI fractions at issue were not determined with any finality when they were published, since they were updated after CMS first published them. Def.'s Cross-Mot at 23. Defendant is quite right that the SSI fractions have changed over time. Indeed, a DSH fraction is necessarily mutable with federal law requiring CMS to update DSH calculations as, for example, the "average [] costs [of inpatient hospital services] for all hospitals" change over time. *See* 42 U.S.C. § 1395ww. More importantly, through the Transmittal, CMS had made a final decision within the meaning of the statute, because CMS definitively alerted providers to forthcoming reimbursements.

The Court having found that the PRRB's conclusion that "a provider may not appeal DSH-related issues prior to the final settlement of its cost report" contrary to law, the Court must vacate the PRRB's decision and remand for further proceedings.  *See PPG Indus., Inc. v. United States*, 52 F.3d 363, 365 (D.C. Cir. 1995).  Plaintiffs, however, would have the Court go further and set aside the fractional determination on the merits.  On the merits, however, the Court has no administrative decision to review.  The PRRB never reached the issue, instead denying the administrative appeal for lack of jurisdiction.  Particularly in light of the rather technical nature of DBH calculations, precisely how the statute should apply is decidedly within the "primary jurisdiction" of the PRRB and CMS.  *See Krukas v. AARP, Inc.*, 376 F. Supp. 3 1, 15 (D.D.C. 2019) (explaining that remand to agency on issue with which it has "special competence" is appropriate even where federal court has subject-matter jurisdiction).  Doing so here ensures that any ultimate legal ruling on the question has the "advantage of [the] agency's specialized knowledge, expertise, and central position within a regulatory regime." *See Pharm. Research and Mfrs. of Am. v. Walsh*, 538 U.S. 644, 673 (2003) (Breyer, J., concurring in part and concurring in the judgment).  Therefore, the Court must "stay further proceedings" while the PRRB evaluates the merits of Plaintiffs' challenge on remand.  *See Reiter v. Cooper*, 507 U.S. 258, 268 (2019) (explaining that stay is appropriate course when court determines agency has primary jurisdiction over issue).

## IV.     CONCLUSION

Because the PRRB erred in concluding that it did not have jurisdiction over Plaintiffs' appeals of the CMS publication of SSI ratios for fiscal year 2007, the Court **GRANTS IN PART AND DENIES IN PART** Plaintiffs' [25] Motion for Summary Judgment and **GRANTS IN PART AND DENIES IN PART** Defendant's [28] Cross-Motion for Summary Judgment.  The

PRRB's jurisdictional decision on January 26, 2017 is **VACATED** and **REMANDED** to the PRRB for appropriate consideration of the merits of the dispute. The Court further **STAYS** this matter pending remand.

Date: October 31, 2023

                                                          /s/
                                        COLLEEN KOLLAR-KOTELLY
                                        United States District Judge